39142. WHITE v. STATE OF GEORGIA.

DECIDED MARCH 16, 1962—REHEARING DENIED
MARCH 29, 1962.

*Houston White, John E. Hogg,* for plaintiff in error.

*Paul Webb, Solicitor-General, Eugene L. Tiller, Wm. F. Buchanan,* contra.

*Amicus curiae brief filed on behalf of State by a group of Atlanta attorneys.*

JORDAN, Judge.  1.  The record in this case is very voluminous and contains the entire record of the proceedings in the *Slater* case.  There are many legal questions raised by the pleadings and various motions made by the defendant White to the order citing him for contempt.  We will elaborate upon the ones which we consider essential to the disposition of this matter.

One of the contentions made by the defendant is that the

order adjudging him in contempt of court is null and void since the court was without jurisdiction to conduct the custody hearing in the matter of *Slater v. Slater* out of which hearing arose the contempt order. This contention is without merit. The court was proceeding in a matter in which the Supreme Court of this State later ruled that it was without jurisdiction. See *Slater v. Slater*, 216 Ga. 242 (115 SE2d 353). In our opinion, however, this has nothing whatsoever to do with the question of contempt presented in this matter. A court cannot be denied the right to maintain order and decorum in a hearing simply because an appellate court might subsequently determine it was without jurisdiction in that particular matter. See *Cobb v. State*, 59 Ga. App. 695, 701 (2) (2 SE2d 116). The order adjudging the defendant in contempt of court was not an order affecting the *Slater* case itself but merely arose out of remarks between the judge and the defendant during the course of such proceedings.

"A court has jurisdiction and is empowered to deal with the matter of contempt at any time during the progress of the litigation before him." *West v. Field*, 181 Ga. 152 (181 SE 661, 101 ALR 465). The defendant in this case, being an attorney, was an officer of the court. The courts of this State, in furtherance of justice, have power to control the conduct of their officers and all persons connected with a judicial proceeding before them. *Code* § 24-104 (4); *Simpson v. Bradley*, 189 Ga. 316 (1, 8) (5 SE2d 893).

The case of *Holbrook v. Prichard Motor Co.*, 27 Ga. App. 480 (1) (109 SE 164) and other cases cited by the plaintiff in error are not authority for this contention.

2. It is also contended by the plaintiff in error that the order of May 5, 1960, was null and void due to the fact that it was entered under the styling of the *Slater* case. The court later entered a nunc pro tunc order changing the style of the case to State v. Houston White. This nunc pro tunc order was also attacked as being null and void. This ground is without merit since the court had authority to correct the styling of its order, which it did. *Code* § 24-104 (6). The case of *Auto Highball Co. v. Sibbett*, 11 Ga. App. 618 (75 SE 914), holds that in a prosecution for criminal contempt the State is a proper party

and that if exception is taken to a judgment attaching a party for criminal contempt the State must be made a party defendant in the reviewing court. In the present case, the State was made a party in the court below and in the bill of exceptions in this court.

3. The plaintiff in error filed a demand for a jury trial on the question of contempt, although he abandoned this point in his brief. He does contend, however, that he was entitled to a fair and impartial hearing by another superior court judge who was in no manner personally embroiled with him. Not only is one held in direct contempt not entitled to a jury trial but, as pointed out in *White v. George,* 195 Ga. 465 (24 SE2d 787), such person is not entitled as a matter of right to even a hearing before the court holding him in contempt. Chief Justice Duckworth, speaking for the court in that case, said, at page 470: "If the court were required to grant the contemnor a hearing before inflicting punishment for a direct contempt committed in the face of the court, it would interrupt the orderly functions of the court. If the contempt consists of a flagrant showing of disrespect for the person of the judicial officer of the court, what good purpose could a showing serve? The contemnor would not lessen his offense by stating the facts on which he based his lack of respect for the judge." He went on to say, "Even though a hearing may not be demanded as a matter of right, we think it would be a wise exercise of discretion for the court to allow the contemnor an opportunity to mitigate his offense by showing that no contempt was intended, or any other mitigating circumstances, except in cases where there could be no excuse for the action of the contemnor." Ibid., p. 470.

The record in the instant case shows that the trial court did grant the contemnor a hearing though not legally required to do so. As a result of such hearing, the trial court gained the impression that the contemnor was apologetic for his remarks and revoked the order holding him in contempt. Being dissatisfied with the order revoking the contempt charge, the contemnor filed a motion to set it aside on the ground that he had not apologized to the court. Though a hearing was given in this case, no good purpose was served since it tended to heap "Coals

on the fire" rather than develop a conciliatory attitude on the part of those concerned in order that an honorable accord might be reached.

4. Prior to the hearing out of which the contempt order arose, the defendant had made a motion for continuance on the ground that he was ill and unable to continue with the case. The record clearly indicates that the defendant at this time was physically impaired, this fact being recognized by the judge himself and confirmed by the doctors who examined the defendant. It is strongly urged therefore that the judge was without authority to place a condition upon granting the motion for continuance, the condition being that the custody of the children involved be relinquished to the mother under a ne exeat bond until the defendant recuperated sufficiently to proceed with the case. Whether or not the judge should have attached such a condition to the granting of the motion for continuance must be viewed in light of the fact that Mr. White, the defendant, had instructed his clients not to turn the children over to the mother pending the outcome of the hearing then under way. Under the order existing at the time, the mother was entitled to have custody of the children on every other weekend. It must also be viewed in light of the fact that the hearing had previously been delayed on three or four occasions on motion of Mr. White that he was ill, and in further light of the fact that Mr. White on the preceding day had asked the court to adjourn the hearing at 3:25 p.m. (which was done) in order that Mr. White might appear on behalf of another client in a justice of the peace court in the southern part of the county. But even assuming that such a condition placed on the granting of the motion by the judge was entirely without justification or authority, or assuming that he had simply denied the motion for continuance made by the defendant, the serious question remains whether such action on the part of the court would have excused or justified the remarks made by the defendant to the court. Does the fact that the court has made a ruling which seems completely unjustified or beyond the authority of the court give the aggrieved party the license to use contumacious language in the presence of the court concerning such a ruling? We think not.

The question therefore presented is whether or not the language set forth in the contempt order was disrespectful or contumacious. We think that it was. In *White v. State of Ga.,* 71 Ga. App. 512, 513 (31 SE2d 78), the following language was used by an attorney to the court: "I think your Honor has such antagonism toward me personally that I just can't, your Honor, seem to try a case before you without you jumping on me unnecessarily. That is not necessary, but that is the way I feel about it." Of this language the court said: "In our opinion it clearly implied that the judge was not an impartial and upright jurist, but, on the contrary, that he allowed his personal feelings of antagonism to White to influence his rulings in the case then on trial. We hold that the language was disrespectful and contemptuous, and authorized the sentence imposed by the trial judge."

We think that the language used by Mr. White in the instant case likewise implied that the judge was not impartial and would allow his personal feelings toward White to influence his rulings in the case then being heard. In any event, the judge considered the remarks by White to be disrespectful and contemptuous, and appellate courts will not interfere in such a judgment unless it manifestly appears that there has been a flagrant, enormous, or gross abuse of discretion. " . . . [T]he discretion of the judges of the superior courts in all matters pertaining to contempt of their authority and mandates will never be controlled unless grossly abused." *Hayden v. Phinizy,* 67 Ga. 758, 760; *Remley v. DeWall,* 41 Ga. 466. "Questions of contempt are for the court treated with the contempt; and its decision ought to be final, except, perhaps in the case in which the decision shows an enormous abuse of the discretion." *Cabot v. Yarborough,* 27 Ga. 476.

This is as it should and must be. Courts must have authority to maintain order and decorum and to command the respect and dignity required for the orderly administration of justice. At the same time, attorneys before the courts must be free to vigorously represent their clients and to urge and insist upon the courts the legal positions taken on behalf of such clients. An attorney who fails in this, fails a most important and sacred

duty to his client. In so doing, however, the attorney must maintain towards the court a respectful attitude, not for the sake of the incumbent of the office, but for the supreme importance of the office itself.

We are of the opinion in this case that Mr. White, though vigorously and ably representing his clients, and for whatever reasons motivating his remarks, was properly held in contempt by the court and that the court did not abuse its discretion in so holding.

5. The other contentions of the plaintiff in error as set forth in the remaining assignments of error are without merit.

*Judgment affirmed. Carlisle, P. J., Bell, Frankum, and Hall, JJ., concur. Russell, J., concurs specially. Felton, C. J., Nichols, P. J., and Eberhardt, J., dissent.*

RUSSELL, Judge, concurring specially. The trial judge should have granted plaintiff in error a continuance for proven sickness. Statements of the trial judge and medical examination (by county doctors) clearly indicate this.

When the trial judge determined that a continuance was demanded he should not have attached certain conditions thereto. These and the question of jurisdiction could have been vexatious to a sick attorney.

The fact that the court was in error, the failure of the court to grant a continuance and sickness of counsel do not relieve counsel of his obligations to the court. These constitute facts which should be considered by the trial judge as to whether or not a contempt has been committed. If the trial court determines that a contempt was committed, then these facts should be considered in mitigation in assessing punishment.

Error on the part of the trial court, and sickness on the part of counsel are not matters of absolution for the crime of contempt.

The respect and absolute decorum which a lawyer owes to the judge on the bench is exacted, not because of the person of the man within the robe, but as a tribute to the same high standards of respect for the law which the court in its representative capacity embodies, and the outward expression of that respect, to the office regardless of the man, is a necessary attribute of the administration of justice. It was early held and has

been often repeated that in contempt cases the discretion of the judges of the superior courts will never be controlled unless there is a gross, flagrant, and enormous abuse of discretion. *Cabot v. Yarborough,* 27 Ga. 476, supra.

Therefore, the case should be affirmed.

EBERHARDT, Judge, dissenting. I am in complete agreement with what the majority say in their opinions about the right and duty of a court to maintain order and decorum, and to take such measures as may be necessary to preserve these. I agree that what happened in this case, would under any normal or ordinary circumstance, come within the ambit of *White v. State of Ga.,* 71 Ga. App. 512 (31 SE2d 78). But the circumstances here were not usual, normal or ordinary, and for that reason I must disagree as to the result.

"The cold typewritten transcript is neither a phonograph nor a photograph, nor can it present the atmosphere of a trial." *Werk v. Big Bunker Hill Mining Corp.,* 193 Ga. 217, 234 (17 SE2d 825). Thus, we can not know the exact posture of the matter as it appeared from behind or before the bench. Counsel for the defendant in error cite, as illustrative of the situation, the numerous intemperate, even abusive, references made in the brief of plaintiff in error relative to the judge. These I discount, for in the very nature of things one who represents himself finds it difficult, if not impossible, to be objective in a matter so personal as this.[1]

It is clear, however, that Mr. White was a sick man—almost physically exhausted. When the case to be tried was called for announcement he, in good faith, stated the facts relative to his illness and urged a continuance. It was not granted and he engaged in arguing the demurrers during the first day. On the

---

[1]The right of one to appear pro se is generally recognized. 5 Am. Jur. 267, Attorneys at Law, § 10; Osborn v. Bank of the U. S., 9 Wheat. (22 US) 738, (6 LE 204) ; People v. Northcott, 209 Cal. 639 (289 P 634, 70 ALR 806). But the wisdom of so doing has been questioned—even to the extent of quoting the maxim that "He who acts as his own lawyer has a fool for a client." Shinn v. State, 31 Okla. Cr. 366 (239 P 269).

second day he again stated his condition and urged a continuance. It was not granted and he proceeded in the trial. His condition grew worse. He was emotionally disturbed. On the morning of the third day he again asked for a continuance because of his illness, stating to the court that "I had a pretty bad night. I can't continue—Excuse me, judge. I had weak spells all night, I couldn't stop crying. I don't know what is the matter with me. I am so weak I can hardly stand up." He had previously stated that he was under the care of a physician and offered to obtain from the doctor a certificate as to his condition, and Judge Alverson had previously remarked from the bench that "Mr. White has been sick, Mr. Brooks. There is no doubt about that. I can tell that he has been sick. It is obvious that he has been sick." However, Mr. White was requested by the court, and he consented, to undergo a physical examination by doctors of the court's choice. They reported to the court that he was indeed sick and unable to proceed with the trial of a case.

If the motion for continuance had been granted in the beginning, as I think it should have been, the untoward events that followed and which are now here for review would, in all likelihood, never have happened. Statements were made to the court by counsel that were unkind, sharp, disparaging, perhaps even castigating. By all normal standards they were contumacious, and we deplore them. But normal standards can not be applied when the man himself is not normal.

If Mr. White had taken advantage of the opportunity that was tendered him several times to apologize for his affronts, the matter would have ended and would not now be here. It is observed, however, that he was not adjudged in contempt for his failure to apologize and that is not an issue. Indeed there is grave doubt that such could form any basis for a citation or that any sanction could have been applied therefor. See State v. Pendergast, 39 Wash. 132 (81 P 324).

The issue is, then, whether the circumstances were such that a citation should have been issued and a sanction applied. I think not. The action of the court should have been suited to the very circumstances themselves, including Mr. White's illness.

The view here expressed is limited to the facts of this case.

It is not to be construed as having any application to a situation in which the attorney, because of a self-induced condition from drink or drugs, or because of excitement induced by the heat of the trial, commits some act or makes some statement or remark that in its nature shows a disrespect to or contempt of the court. The attorney's physical or mental condition in such circumstances as those would constitute no defense to a charge of contempt.

All must learn that sharp words never help a situation. "At last it biteth like a serpent and stingeth like an adder." Much better is the "soft answer [that] turneth away wrath."

FELTON, Chief Judge, dissenting. I agree with Judge Eberhardt that Mr. White should not have been cited or declared guilty of contempt in view of his physical condition at the time of the alleged acts of contempt. The official adjudication of contempt was made after all of the matters in question had occurred and at a time when the judge knew that Mr. White was sick, as shown by the certificates of three doctors and as shown by the statements of the judge himself. On the very first day of the hearing Mr. White moved for a continuance. The judge refused because Mr. White did not have a doctor's certificate, but the hearing was not recessed to allow time for getting the certificate. At the time of all of the instances of adjudged contempt, except the first one, the judge had conclusive evidence of Mr. White's condition. One does not have to be an expert of any kind to know that bad health adversely affects one's disposition, speech and conduct even under ordinary conditions. Under the facts shown above I cannot understand how anyone could refuse to exonerate Mr. White of the misconduct charged against him.

1. As to the first item of alleged contempt the judge took the position that he had authority to transfer the jurisdiction of the minor children from the juvenile court to the superior court after such jurisdiction (as to final disposition of the question of custody) had been delegated to the juvenile court. At the time of the first item of the citation, above shown, Mr. White had already made one or more motions for a continuance, which had been denied but the judge had not at that time procured

the doctors' certificates. Upon hearing the judge's view that he had a right to reacquire jurisdiction of custody Mr. White stated: "That legal position, I most respectfully say to you, is not sound." If a lawyer cannot make that contention, or one of the same import, before a trial or appellate judge, there would be more lawyers in jail than out and we would have to get another form book to provide us with acceptable motions for rehearings. As previously stated, I do not think any finding of guilt is authorized because of the illness of Mr. White, but as to this first item I would reach the same conclusion if Mr. White had not been sick. Mr. White had a right to say what he did as to this specification, but the judge was not satisfied, for some unstated and unknown reason, so he admitted that the statement was respectful but said "I don't think the word exactly indicates the actions." Whatever that meant, Mr. White thought that something he had said or done was unsatisfactory with the court so he made what came out as a so-called contemptuous statement. Obviously, Mr. White was making an effort to appease the court. The statement is ambiguous and does not necessarily mean that inwardly Mr. White had no respect for the judge. In view of the court's implied invitation for Mr. White to defend an undefinable accusation, I think the benefit of the doubt should be resolved in Mr. White's favor as to this, the first, specification, regardless of his illness.

2. The second specification of contemptuous conduct is that Mr. White said "Most everything I say I mean to be in a contention please, sir, I am not saying to you flatly so that you will get your dander up about me making statements." The setting and circumstances at the time of the second alleged contempt had completely changed from those existing at the time of specification number one. At the time of the second alleged contempt the court, although he knew and had proof of Mr. White's illness and was required by law to grant him a continuance without any conditions or qualifications, was endeavoring to force Mr. White to have the people to whom temporary custody had been awarded by the juvenile court surrender custody to the children's mother, Mrs. Slater, III, until the hearing of the case was resumed as a condition to the judge's granting a con-

tinuance. In the absence of Mr. White's acquiescence to such an unjustifiable proposal by the judge, he urged Mr. White to withdraw his motion for a continuance, which Mr. White refused to do. At this stage of the proceeding, it is conceded that the mere fact that the judge might not have had jurisdiction to reacquire jurisdiction over the custody question would make no difference on a question of the behavior of the lawyers and the right to cite for contempt, assuming that the hearing did not degenerate into a non-legal controversy for a period of time. But it is another and quite different thing for the court to attach as a condition precedent to granting a continuance which the law required him to grant without condition the requirement that Mr. White accede to the condition precedent. Such a position on the part of the judge was wrong, arbitrary, unreasonable and inexplicable. It was, in my opinion, so objectionable that it lost the character of judicial action and any alleged contempt could not be said to be of the office and not the individual occupying it. 173 ALR 802. The hearing, from the time the judge took that egregiously erroneous position to the time he granted an unconditional continuance so far as Mr. White's part in it was concerned *and took upon himself the responsibility of delivering the custody of the children to Mrs. Slater, III, until the case was taken up again,* was not a judicial proceeding. The judge at this time was not determining the question of the custody of the children, temporary or permanent, so the fact that Mr. White advised or told the custodians of the children not to let Mrs. Slater, III, have possession of the children while the present hearing was going on, because he feared the children would be removed from the State contrary to the orders of court, as had been done on a previous occasion, had no relevance to the question whether the judge's attempted effort to force acceptance of the condition he proposed to put on the grant of a continuance was under any theory justified. It should be noted that the custodians of the children had been removed from the case as parties by the ruling of the court, so no binding judgment on the question of custody, temporary or permanent, could have been legally rendered in the case being tried. (As a matter of interest, the Supreme Court decided in

*Slater v. Slater*, 216 Ga. 242, 115 SE2d 353, that the court could not reacquire jurisdiction from the juvenile court.) It is my view that during the time the judge was trying to force Mr. White to accept his condition to the grant of a continuance there was no legal trial in process in which a contempt of court could be committed. In addition to that, the statement of Mr. White's in specification two was not contemptuous. He did not accuse the judge of having got his dander up. He said he was trying to avoid provoking such a consequence. This charge is too thin to stand the test of reason and authorize punishment to a well man, much less a sick one.

3. The same setting and circumstances were present at the time of specification number three. As to this specification, I would ordinarily rule that the contempt judgment was authorized and direct that the punishment be inflicted unless an apology was made. In the circumstances of this case, meaning Mr. White's proved illness, which the judge recognized at the time, and the court's illegal and non-legal effort to force the acceptance of a condition to a continuance he was required to grant without a condition, I dissent from the judgment finding the contemnor in contempt.

4. I am not sure that this last is a specification of contempt, as it is not preceded by asterisks. If it is a specification, I dissent from the judgment on it. What I have said about the sickness of Mr. White and the judge's non-legal procedure for a long period during which all but the first alleged contempt occurred applies to this specification if it is one. Furthermore, the judge was merely giving an opinion as to how much time Mr. Brooks had taken in the presentation of evidence and argument in the case and that all the rest had been used up by Mr. White. The judge did not intend to state the exact time taken by Mr. Brooks and what Mr. White said did not mean that the judge deliberately lied. His statement, reasonably interpreted, simply means that the judge's estimate was not quite right.

I think it appropriate to quote some of Justice Frankfurter's language in his dissenting opinion in the case of Sacher v. United States, 343 U.S. 1, 34, 38-40 (72 SC 451, 96 LE 717). This quotation is appropriate here although Justice Frankfurter was

discussing another question. ". . . . The certificate of the trial judge quotes excerpts of the record from the principal case. But these excerpts are too brief for a picture that even remotely reveals the course of the trial. The specified contempts cannot properly be appraised with a view to determining the procedure appropriate for dealing with them, unless they are given a much more balanced perspective than can be got from the certificate of contempt. In order to put the specified contempts in their trial setting, an appendix to this opinion supplements the meager excerpts in the certificate. The only adequate way to document this case would be to make the whole Dennis record part of this opinion, as did the trial judge by reference in his certificate. But even within the limits of space imposed by an appendix it is indubitably established that the judge felt deeply involved personally in the conduct for which he punished the defense lawyers. He was not merely a witness to an occurrence, as would be a judge who observed a fist fight in his courtroom or brutal badgering of a witness or an impropriety towards the jury. The judge acted as the prosecuting witness; he thought of himself as such. His self-concern pervades the record; it could not humanly have been excluded from his judgment of contempt. Judges are human, and it is not suggested that any other judge could have been impervious to the abuse had he been subjected to it. But precisely because a judge is human, and in common frailty or manliness would interpret such conduct of lawyers as an attack on himself personally, he should not subsequently sit in judgment on his assailants, barring only instances where such extraordinary procedure is compellingly necessary in order that the trial may proceed and not be aborted. Summary punishment of contempt is concededly an exception to the requirements of Due Process. Necessity dictates the departure. Necessity must bound its limits. In this case the course of events to the very end of the trial shows that summary measures were not necessary to enable the trial to go on. Departure from established judicial practice, which makes it unfitting for a judge who is personally involved to sit in his own case, was therefore unwarranted. Neither self-respect nor the good name of the law required it. Quite otherwise. Despite the many incidents of

634

contempt that were charged, the trial went to completion, nine months after the first incident, without a single occasion making it necessary to lay any one of the lawyers by the heel in order to assure that the trial proceed. The trial judge was able to keep order and to continue the court's business by occasional brief recesses calculated to cool passions and restore decorum, by periodic warnings to defense lawyers, and by shutting off obstructive arguments whenever rulings were concisely stated and firmly held to. This, then, was not a situation in which, even though a judge was personally involved as the target of the contemptuous conduct, peremptory action against contemnors was necessary to maintain order and to salvage the proceedings. Where such action is necessary for the decorous continuance of a pending trial, disposition by another judge of a charge of contempt is impracticable. Interruption for a hearing before a separate judge would disrupt the trial and thus achieve the illicit purpose of a contemnor. But the administration of justice and courts as its instruments are vindicated, and lawyers who might be tempted to try similar tactics are amply deterred, by the assurance that punishment will be certain and severe regardless of the tribunal that imposes it. It is a disservice to the law to sanction the imposition of punishment by a judge personally involved and therefore not unreasonably to be deemed to be seeking retribution, however unconsciously, at a time when a hearing before a judge undisturbed by any personal relation is equally convenient. It does not enhance a belief that punishment is a vindication of impersonal law; it does not fortify the deterrent function of punishment. Had the judge here found the petitioners guilty of contempt during the actual course of the trial a different problem would be presented. Even then, however, only compelling circumstances would justify a peremptory judgment of contempt. For while 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence,' the power that may thus be exercised is 'the least possible power adequate to the end proposed.' Anderson v. Dunn (US) 6 Wheat. 204, 227, 231 [5 LE 242, 247, 248]. Resort by a judge to criminal sanctions without the usual safeguards in

imposing punishment is to be supported only if the moral authority of a trial judge cannot command order and respect, only if a firm reprimand calculated to secure obedience would not halt an incipient course of misconduct. Criminal justice is concerned with the pathology of the body politic. In administering the criminal law, judges wield the most awesome surgical instruments of society. A criminal trial, it has been well said, should have the atmosphere of the operating room. The presiding judge determines the atmosphere. He is not an umpire who enforces the rules of a game, or merely a moderator between contestants. If he is adequate to his functions, the moral authority which he radiates will impose the indispensable standards of dignity and austerity upon all those who participate in a criminal trial. Truth compels the observation, painful as it is to make it, that the fifteen volumes of oral testimony in the principal trial record numerous episodes involving the judge and defense counsel that are more suggestive of an undisciplined debating society than of the hush and solemnity of a court of justice. Too often counsel were encouraged to vie with the court in dialectic, in repartee and banter, in talk so copious as inevitably to arrest the momentum of the trial and to weaken the restraints of respect that a judge should engender in lawyers. Counsel were not made to understand that in a criminal case not merely the liberty of individuals is at stake. Law itself is on trial as the 'stern daughter of the voice of God.' Throughout the proceedings even after the trial judge had indicated that he thought defense counsel were in conspiracy against him and were seeking thereby to subvert the trial, he failed to exercise the moral authority of a court possessed of a great tradition. He indulged them, sometimes resignedly, sometimes playfully, in lengthy speeches. These incontinent wrangles between court and counsel were punctuated by occasional minatory intimations from the Bench. As in the case of parental warnings to children, feckless repetition deprived them of authority. To call counsel officers of the court is no idle phrase. Our whole conception of justice according to law, especially criminal justice, implies an educated, responsible, and independent Bar. Counsel are not freed from responsibility for conduct appropriate to their func-

tions no matter what the encouragements and provocations. Petitioners must be held to strict accountability for the contempts they committed. But until the inherent authority that should radiate from the Bench is found ineffective in securing seemly conduct by counsel, there is no need for drastic peremptory procedure in bringing contemnors to book even during a trial. History records too many abuses to look indulgently upon the exercise of such arbitrary power. . . ."

I am authorized to say that Presiding Judge Nichols concurs in this dissent.

APPENDIX TO THE DISSENT OF JUDGES FELTON AND NICHOLS.

There follows a statement of some of the record recited in the bill of exceptions and the exhibits attached thereto and certified by the trial court, which throws light on the questions discussed in the majority and dissenting opinions. ". . . April 13, 1960. 'Mr. White: I am down here and state to you that I am not able to go to trial with this case today and I want to move the court, please, sirs, put this case off long enough to let me— I have asked here for a leave of absence—to give me a chance to get well. The Court: Mr. Brooks, would you like to address the court? Mr. Brooks: Your Honor, this is about the fourth time Mr. White hasn't advised me at all today. I called him at his office. He was at his office today as I called him and talked to him about the notice to produce that I have served on one of the defendants in this case and Mr. White said nothing at all to me about postponing the case. I just humbly and respectfully ask the court that under the circumstances, this case has been put off three times or four times, that the case be heard. The Court: Mr. White has been sick, Mr. Brooks. There is no doubt about that. I can tell that he has been sick. It is obvious that he has been sick. Mr. Brooks: Your Honor, I was served only yesterday with additional lengthy pleadings in this case, answers to the motion by the plaintiff in this case, signed by Mr. White. I hesitate, Your Honor, to take issue with him in that respect, but I just would like to get a trial, Your Honor, and I don't think the circumstances bear out the facts Mr. White ought to be entitled to another continuance. The Court: Well, Mr. White, if you are willing to continue we will go ahead and

proceed. Mr. White: I am not willing. I made the motion to continue it and I made it in all good faith. If you are—I will go ahead, because I am not going to leave a client. I will do the best I can. The Court: All right. Mr. White: I take it you will . overrule my motion.' Thereupon the argument on the demurrers proceeded, until the court recessed. At 10:30 o'clock a.m., pursuant to the direction of the court, on April 14, 1960, the parties and the counsel assembled in court. Said Houston White, counsel for the plaintiff in error, again moved the court for a continuance, at which time the following took place: 'The Court: Mr. White, I have decided to sustain your special demurrer No. 7, and have stricken Mr. and Mrs. Robert L. Slater, Jr., as parties in this case. I think you are correct in your contention in that respect. I am signing the order now and I will give each of you gentlemen a copy. Mr. White: Judge, I have done the best I could to try and prepare a bill of exceptions to tender to you. Beryl will be here, he is coming with it. I will have to change it some now. The Court: I don't think we should hold up the issue. I have signed the order. Go ahead and proceed. Mr. White: I thought you wouldn't mind if I asked you to do that. I move the court to please wait until my bill of exceptions is here, be here in a few minutes. The Court: I don't think it is necessary to hold up the proceedings to taking the time to study the matter. I would have signed this yesterday but I had some doubt about it. You can go ahead. Mr. White: I am going to ask for the rule in the case. The Court: Swear all the witnesses. (Witnesses Sworn.) (Whereupon the rule was invoked and the witnesses sequestered.) Mr. White: May I renew my motion on the grounds I stated to you, that I am not physically able to go on with his trial? The Court: Let the record show that no doctor's certificate has been presented and I granted a two weeks recess in this case in order for Mr. White to recuperate from his illness and we proceeded with the trial of the case yesterday. This is the 14th, the next day, and apparently your physical condition is as good as it was yesterday and therefore we will proceed. Mr. White: Well, at that time I made a motion yesterday I would like—at that time which you overruled and I just felt like I should renew it this morning in

justice to myself. I went out to the doctor straight from my home, sir, and got shots the best I could to hold myself together, but I didn't have anything out there to get the certificate with so I came back to my office and asked Beryl to get those up and he has gone to get them for me and he will have a doctor's certificate down here shortly. A doctor's certificate that says in so many words that I am not in shape and it will be here, sir. The Court: All right. Go ahead. Proceed.' That thereupon the trial of said case proceeded to a hearing of evidence as follows: . . . Mr. White: Now I want to enter this blanket objection to any and all testimony in the proceeding with respect to the custody of these minor children, Cynthia Jean Slater and Kandy Lee, on the ground that the court has no jurisdiction of said subject matter and that I am taking part in this at this time at the court's direction because of the overruling of the motion for continuance, and I feel that I should make a blanket objection, sir, to preserve my rights at the beginning with respect to any and all testimony at this time with respect to the subject matter of the custody of these minor children, please, sir. The Court: All right. You may do so and it is impressed in the record. I would like for the record to show that you argued the demurrers very vigorously yesterday for several hours, Mr. White, and you appeared during the argument of the demurrers to be physically able to argue your points, therefore, that is the reason the court is proceeding at this time to proceed with the merits of the case. Mr. White: Well, all I can say, Judge, I appreciate your statement about the appearance, it was a little bit deceitful because I didn't feel like doing anything yesterday and I did the best I could, because I am not going to desert these people if I have to be here the rest of the time on a stretcher, please, sir. The Court: All right.' . . . During the course of hearing testimony on April 14, 1960, the following occurred: 'Mr. White: Your Honor, I want to tender to you please sir, in behalf of Robert Lee Slater, III, a bill of exceptions to the order overruling the demurrers with respect to him and I am going to get up a copy and show it to Mr. Brooks in a minute, but I had to change it and I want you to please just mark it tendered if you would, please sir. The Court: Let's go on with the hearing and

I will look at it after the hearing. Mark it tendered after. Mr. White: You will consider it tendered now? The Court: I will consider it tendered afterward. Mr. White: No, sir, I am asking for it to be tendered now. The Court: I am telling you to proceed with the trial of the case.' During the hearing of the testimony on April 14, 1960, the following occurred: 'Mr. Brooks: I want to object to this testimony on the ground the Slaters have no legal claim to these children under cases in the State, the question in dispute here is between the defendant as to who gets custody of these children, and any evidence as to fitness or unfitness of Mr. and Mrs. Slater would not be admissible in a trial of this matter. The Court: I think before you go into the possibilities of the children being placed in some place other than with the mother and father you would have to prove the unfitness of the mother and father. Mr. White: Your Honor, you see he has alleged that the children are placed in the possession of Mr. and Mrs. Slater. The Court: But the issue as I see it before the court at this time is whether or not the mother or the father would have custody of the children. Mr. White: No, sir, you see, the mother is asking for the custody here and we are taking the position that the custody is in Mr. and Mrs. Robert L. Slater, Jr., and the son, that is, Bobby, Robert Lee, III is not asking for the custody in this proceeding, Your Honor, and he does not have the custody, he does not have the custody, that is in Mr. and Mrs. Slater, and for that reason, please, sir, I just want to give you the circumstances surrounding. If you desire to disregard . . . The Court: I would like to know something about the present situation under which the children are living at this time. Mr. White: I felt you should know the whole story. The Court: Well, I think this is before the court. Mr. White: If in your thinking you concede, and you would have to concede, of course, that the temporary custody is in these people. The Court: No, I am not conceding that. I say it seems to me from the record that the children have been temporarily placed with Mr. and Mrs. Slater, Jr. Mr. White: Surely. The Court: And the issue before the court now is whether or not custody of the children will be either in the father or the mother, if the father isn't asking for the custody it seems to me that it wouldn't

be very much of an issue. Mr. Brooks: That is what I would like to be heard on. The Court: I will hear from you. Mr. White: I felt, Judge, that you ought to get all the facts, and then if you want to rule as a matter of law, of course, you have not got any jury and since you are going to hear the evidence, and you so told me you were going to hear the evidence, I state to you in my place, sir, that the possession and custody of those children are now in Mr. and Mrs. Robert Slater, Jr., and we say most respectfully, in the phase of your ruling that I contend that is correct. The Court: Well, that is your contention, I understand that to be your contention. Mr. White: Yes, and I thought you understood it, sir, but I want to make that clear to you. The Court: Well, I want it to be clearly understood my interpretation of the situation was that the children were temporarily placed with Mr. and Mrs. Slater, and the issue before the court at this time is who would have custody. Mr. White: The custody insofar as the children are concerned, we contend, and now since you have stricken these people as parties, we cannot of course contend it in their behalf in this proceeding, but we have set up in this proceeding and—The Court: You asked that they be stricken as parties. Mr. White: Yes, I did, because this is a divorce case proceeding. The Court: This is correct. I thought you were correct in that. Mr. White: What? The Court: I thought you were correct. Mr. White: Well, I say they are now and I am not in position to ask for custody for them as a party in this case, so the point is, is that what you should do, if you do any kind of awarding at all, you should still award the custody to the people, these third persons. The Court: That is just what I said a moment ago, I think this court in order to do that would have to find both the mother and father as unfit persons. Mr. Brooks: May I interrupt, because he has stated Mr. Slater, III is not asking for custody, so that eliminates him. Mr. White: That legal position, I most respectfully say to you is not sound. The Court: Well, Mr. White, the Supreme Court of the State of Georgia can correct any mistake that I make and I think it is up to them to correct me instead of you correcting me. Mr. White: Do you mind if I take those positions? The Court: I don't mind you taking

positions. Mr. White: Well, I have tried to say it most respectfully. The Court: Well, you said it most respectfully but I don't think the word exactly indicates the actions. Mr. White: Well, regardless of the innermost thinking, sir, outside I have tried to maintain respect for this court, sir, and I have tried to take the position—I do think you have been wrong, think you have been wrong, sir, in what you have done, you should have sustained all the demurrers, and when I say that I mean that most respectfully. And when you have done otherwise I have to recognize the case like it is dressed in the clothes in which it is now dressed. The Court: Well, I think the court clearly understands your position and you don't need to continue to restate what you think. Mr. White: You don't award custody by default ever, you look into the situation. The Court: Proceed with your examination. Mr. White: I thought maybe you would like to hear the facts. Mr. Brooks: I would like to be heard on this point and I can give you authorities, I have them on my page there. The courts of this State since the Emancipation Act of 1913 have held that the legal right to custody of children born of a marriage, such as the case at bar, vest in the mother and the father equally, that their claim to legal custody of the children is superior to all others. There are cases directly on point. The Court: I know that. Mr. Brooks: Now, therefore, the question before this court is who is entitled to custody between these two parties. And the only way that Your Honor can give custody of these children to any other persons other than these two would be to find that both of them have forfeited their parental rights, both of them unfit and have forfeited the parental rights because the cases hold that you must grant custody to those who are legally entitled to same unless they forfeit it. Now, he says that Mr. Slater, III, the defendant in this motion, is not asking for custody, doesn't want custody. We have proved her fitness and unless he disproves same, not anything about Mr. and Mrs. Slater, Jr., unless he proves to this court that she has forfeited her right, then she under the Supreme Court decision is legally entitled to custody of these children, and I have got the cases right in point. The Court: I will be glad to just take your citations, you don't need to go into

them. That is my understanding of the law. Mr. Brooks: No question about it being the law. Mr. White: I can give you those—Mr. Brooks: 181 Georgia, 181; 200 Georgia, page 354; 194 Georgia, 527; 201 Georgia, 834. Those cases hold in essence that although you have got broad discretion in awarding custody of children that you should be governed by the rules of law in granting to parties having the legal right. Mr. White: It is my contention, if Your Honor please, that they have got to show a change in condition here since the time of this award to Mr. and Mrs. Slater, Jr. They haven't shown any change in condition which would entitle her to regaining any custody. My purpose is to show where they are, show they are well taken care of, and to concede that for that purpose, then I will confine myself to showing that the mother is an improper person. Now I am going to show you that the mother is an improper person but I thought you wanted to know during the interim that the children are properly taken care of and that they were in the hands of these people, and I ask Your Honor to let me show that, to show that they are now well taken care of, that there has been no change in condition from the time they originally got it, got the custody of these children under that temporary placement order, and from the time of the final divorce decree, and that the only change has been to the better in that Mr. and Mrs. Slater now have a bigger play yard than they had when they originally had a home when these children were put in their possession. And she alleges in paragraph thirteen: She further shows that the temporary placement in the home of Mr. and Mrs. Robert L. Slater, Jr., has not been, is not now, and will not in the future be for the best interest of the welfare of said minor children. Now he has got to show that sort of a situation in order to prevail in this case. The Court: You proceed. I think I have already told you I would like to hear about it anyhow. Mr. White: All right, I didn't understand. The Court: I said that a long time ago. Mr. White: I beg your pardon, sir. The Court: Yes.' During the course of the testimony by Mr. Marvin G. Russell, who was called as a witness by plaintiff in error in behalf of his clients, on April 14, 1960, the following occurred: 'Marvin G. Russell, being first duly sworn, testified as follows: Direct

examination by Mr. White: Q. What is your name? A. Marvin G. Russell. Q. Where do you live and what do you do? A. I live in Atlanta, Fulton County, and I practice law. Q. Mr. Russell, I will ask you, please, sir, here is a restraining order of March 3, 1958, signed by Honorable Claude D. Shaw, in Case A-65888, attached thereto the original answer and cross-petition of Robert Lee Slater, III. Now, will you take that in your hand and tell me if you have ever seen that before? A. Yes, sir. Q. Did you have any occasion to do anything about it in the presence of any other persons, such as Mrs. Slater here, and Mrs. Dodd and the parties to that litigation? A. Yes, sir. Q. What was it, will you explain to the court? A. I don't want to be placed in a position of violating any privileged communication or anything like that, Judge. The Court: Well, I'll leave that up to you. By Mr. White: Now who was present when it happened? A. Mrs. Slater, Mrs. Norma Dodd Slater, Mrs. Jimmy Lee Dodd, Mr. and Mrs. Slater, Mr. Bobby Slater, Mr. Bobby Slater's mother, Mr. Swift Tyler, representing then Mr. Bobby Slater, and myself on the fourth floor in the Fulton County Court House in the jury room across the hall. Q. All parties there? A. Yes. Q. Parties to the litigation? A. Yes. Q. What did you say about that order, please, sir? A. Well, we assembled that morning in response to a nisi and Mr. Swift Tyler had not filed any response until that morning and he filed it and called my attention particularly to this order and said, now I want you to know about it and I don't want any misunderstanding about it. And I read it and we asked Judge Shaw for permission to discuss the case, seeking some temporary solution to it, and we all retired by agreement to the jury room. By the Court: Q. If there was some statement made with the view of settling the case, I wonder about that. A. I didn't mean—I said the purpose of retiring to the jury room was for the purpose of disposing of some temporary issues in the case. Q. To settle some temporary issues? A. Yes, sir. Mr. White: All I want to show is that the lady had knowledge of the order. Mr. Brooks: He can show it and I don't think that is material and I object to it, of course—Mr. White: She has already testified she didn't know about it. The Court: Let me see it—go

ahead. By Mr. White: Q. I will ask you, please sir, whether or not you did read that order out loud in the presence of Mrs. Norma Jean Dodd Slater. Mr. Brooks: That is a communication between attorney and client and I believe under the rules— if he represented Mrs. Slater at the time—By the Court: Q. Who did you represent? A. I represented at that time Mrs. Norma Dodd Slater. Q. Certainly you shouldn't testify—Mr. White: Wait a minute. All the parties were there, everybody was there, sir. By Mr. White: Q. Did you speak just to her or did you speak to anybody else? A. I spoke to Mrs. Dodd in particular. Q. Mrs. Dodd? A. Mrs. Dodd. Q. That is her mother? A. That is Mrs. Slater's mother, Mrs. Slater was sitting next to me and Mrs. Dodd just beyond her and I told them at Mr. Tyler's request I wanted to read this order, and I did, and I read it. And I thought I read it in a manner where they heard it. I heard no complaint against it. Q. Did Mrs. Dodd make any comment in the presence of Mrs. Slater? Mr. Brooks: What would that have to do with this case, what Mrs. Dodd might have remarked, any remark she made to Mrs. Slater? The Court: I will get your view on that. Mr. White: It would tend to show, and very material and relevant, the intentions of these people. The Court: Well, the intention of Mrs. Slater, I can see that, but the intention of Mrs. Dodd hasn't come into this case as yet. Mr. White: Please sir, it was said in the presence of Mrs. Slater and later on you remember—in evidence that Mrs. Slater and Mrs. Dodd took the children to Florida. That was in evidence. That has been in the evidence so far. The Court: I recall you asking something about it. Mr. White: That is what she said, and she said she didn't know about the order. Now that is what Mrs. Slater said, and now the question is what remark did Mrs. Dodd say in the presence there of Mrs. Slater after you read the order. The Court: Do you have any objection? Mr. Brooks: Yes, I have already objected to it. I say what Mrs. Dodd might have said about this order wouldn't have any bearing or throw any light on this case before the court now. I object to it. Mr. White: In the presence of a party, it is very material. The Court: Objection is sustained. Mr. White: Well, I would like to state into the record that I expect the witness to answer that

Mrs. Dodd said: No superior court judge could tell her what to do. That was what she said. The Court: That was Mrs. Dodd? Mr. White: That was Mrs. Dodd's statement there. By Mr. White: Q. Now, I would like to ask you, who did Mrs. Dodd come down there with? A. Mrs. Slater. Q. Which Mrs. Slater was that? A. Mrs. Norma Dodd Slater. Q. And who did she come to the courthouse with? A. Mrs. Norma Dodd Slater. Q. What activities did Mrs. Dodd have in the matter, do you remember, did she take any part? A. Oh, yes, she was telling me what she wanted done—Mr. Brooks: I object to that, that has got nothing in the world to do with the trial of this case. Mr. White: Makes every bit of that relevant. The Court: I can't see it, Mr. White, what Mrs. Slater may have done and said is certainly relevant and material here, but I cannot see what—Mr. White: Here was a lady that was running the show from the beginning, or at the time running—The Court: Are you testifying? Mr. White: No, I am just arguing, I have got a right to argue. The Court: I think the argument is in the nature of testimony, may very well be true, but not before this court at this time. Mr. White: I have in evidence, Your Honor, the fact that she took the children to Florida, Mrs. Dodd, you have got in the record the rule for contempt in this case— Mr. Brooks: He didn't have any evidence before this court. Mr. White: You signed a rule for contempt, it was referred to juvenile court with other matters. It is one of the matters in this whole case that worries me to death, if one of these people ever get possession of those children they will never turn them back over and they will go to Florida and you won't see them, and I wouldn't see them, and nobody else ever get them back, and no way you can keep it from happening. Mr. Brooks: Highly improper argument. Mr. White: I have got a right to state what I have in mind. The Court: At the proper time, but I don't think this is the proper time. I will hear your argument later. Anything further? Would you like to ask this eminent lawyer a question?' . . . Plaintiff in error recites that at 9:15 o'clock a.m. on April 15, 1960, the following took place: 'The Court: Mr. Reporter, let the record show that the court recessed at 3:25 p.m. yesterday in order for Mr. White to attend a hear-

646

ing before a justice of the peace court for one of his clients in the southern part of the county. Court recessed at that time for Mr. White's convenience so he could be and appear in that court. All right, Mr. White you may call your next witness. Mr. White: I wanted to speak to you privately but I didn't get the chance. I want to say this to you. I hate to say it in public. I had a pretty bad night. I can't continue—Excuse me, Judge. I had weak spells all night, I couldn't stop crying. I don't know what is the matter with me. I am so weak I can hardly stand up. I am going to do everything I can, please. The Court: The court will recess for a few minutes. (Recess taken).' 'The Court: Mr. White, I wonder if you would consent to go over to the Health Department and let them check you? Mr. White: Oh, yes. The Court: I thought you would. If you will go over to the Health Department and see Dr. Neal they will be glad to check you and let me know. Mr. White: Where is it? The Court: The Health Department right in the next block. Go through the Administration Building and right through the back. It is that new building. Mr. White: Dr. who? The Court: Dr. Neal, and we will just wait. Mr. White: As soon as I get my doctor to let him send—do you mind waiting just a minute? The Court: No, no. (Recess taken.) The Court: Mr. White, I have talked to both of the doctors who saw you when you went over to the Health Department. They think that you are not physically able to proceed with the trial of this case. Thereupon the Court said: 'I do think if we recess the trial of this case that the mother of the children should have the benefit of having the children with her until you are physically able to come back, and I think they should voluntarily do that during this interim, particularly since counsel for Mr. Slater, III, has instructed them not to permit the mother to see the children during the pendency of this action, that is, since we have been trying the case. As soon as you are physically able I will set everything else aside because this case is on trial and—Mr. White: Sir, excuse me—The Court: —and I will proceed to try the case. Now, I think Mr. White, what would be advantageous to you would be to take a couple of weeks and go to Florida. Mr. White: That is what I am going to do. The Court: I think if

you get away from your office—I will tell you frankly, I don't see how any human being could carry the load that you have been carrying. Mr. White: I have done too much. The Court: You have just before me, and Heavens, I know you have a lot of other cases pending, you have four big cases before me right now that are very involved cases, very highly technical cases and require the particular type of intelligent legal strategy that you, and very probably very few others in this town could do other than you. And it is enough to cause you to be slow in recuperating from anything as serious as an attack of influenza. And I think that the fact you have been working at home during the time that we have been in the recess of the trial of this case has probably hampered your recovery, and I think if you—Mr. White: Doing the work that I have been doing has been over the telephone. Beryl has done most if it. The Court: You have certainly submitted some very fine motions and papers—Mr. White: Got forms to go by. The Court: Cases that take lawyers hours to prepare, and I know when a man is sick he shouldn't be doing that sort of thing, Mr. White, and I have a great deal of respect for you, and I certainly do not wish to impress upon you any unusual—Mr. White: I will tell you the truth, it was my intention to go to my office and pay off my help and get in a car and go to my sister-in-law's house in Chattanooga, and she is going to nurse me a day or two and then I was going to go straight to Florida, get me strong enough to make the trip. The Court: Now, Mr. Slater, during the meantime you would be willing to let the children stay with the mother until Mr. White gets back will you? Mr. White: Judge, let me answer that, please sir. I want you first to know this, that while the lady testifying yesterday said I ordered these things, I don't order, you are the only man around here that has any authority to do any ordering, but I feel so deeply about this matter, my putting off a case for me on contingency of turning these children over to completely unprincipled people, which I know from past experience, and I know they have taken them for months and months and we have never seen the children, months and months, and this little time here I felt was proper and fair to keep the status in quo until you made your

648

decision. We have not got any money to fight if they go to Florida, and I know that is where they are going to end up. The Court: They are not going to take anybody to Florida, if they do I will see that they are taken care of. They wouldn't take these children out of the jurisdiction of the court. Mr. White: Judge, they don't pay any attention to lawyers, they won't pay any attention to it when the time comes for that sort of thing. Mr. Brooks: I am willing to put Mrs. Slater on the stand and let her swear where she intends to keep them, at Greystone, where she lives now, and she has no intention of taking the children to Florida or out of the jurisdiction of the court. And if Mr. White has any doubt—The Court: Have her take the stand. Mr. White: Just a minute, I will just make this statement and I will make it now, that for me to get a continuance in this matter, if it is necessary for me to agree to that, I will not agree to it, Your Honor, and I hope you will understand. I do it most respectfully, sir. I am not defiant please, sir, I just know what is going to happen and what the complications are, and there is nothing in the world that you can do about it when it happens. That is the sad part of it. I have studied the law pretty thoroughly, and there is not anything you can do, anybody else can do when they get down there, and there will be initiated a whole new proposition and whole new change of condition situation for us to have to litigate. Will you please just let the thing—I am sorry my illness is in it, Judge, I am just as sorry as I can be, and I assure you I am sincere. I have tried to get what little going I can so as not to slow me down. You never saw me duck out of a case in my life, and I don't put cases off, Judge, it is never my business to put cases off. I like to try them and get through with them, please, sir, and this case wouldn't bother me in the least, except that I am a little worried. Here is what I am worried about, my health, I was afraid something would happen during this thing which would give me a six months deal out of the office—The Court: Wait a minute, Mr. White. Mr. Brooks, is your client in position to put up a substantial cash bond, or a bond to insure that these children will not leave the jurisdiction of this court? Mr. Brooks: Yes, Your Honor. The Court: It

seems to me that would settle it. Can she make a $50,000.00 cash bond— I mean a $50,000.00 bond? Mr. Brooks: Yes, Your Honor. The Court: Contingent upon these children remaining within the jurisdiction of this court during the pendency of this case? Mr. Brooks: Yes, sir. We have no objection to it, Your Honor, further providing that she not take them out of the jurisdiction of the court. The Court: I will provide that, I sure will. Mr. Brooks: I state in my place that she has stated to me—and as I say, I am willing to have her put on the stand to testify that she has no intention of taking these children out of the jurisdiction of the court. The Court: Well, have her take the stand.—Mrs. Norma Jane Dodd Slater, being previously sworn, testified further as follows: By Mr. Brooks: Q. Mrs. Slater, in the event the court gives you custody of these children pending the further hearing of this case or—and either in the event he gives them to you by permanent order, where would you keep these children? A. At my home at 1857 Greystone Road, Northeast, Atlanta, Georgia. Q. Is that in Fulton County? A. That is in Fulton County. Q. Do you have any intention of taking them out of the State of Georgia to Florida? A. No, sir. By the Court: Q. As I understand it, Mrs. Slater, you are willing to post a $50,000.00 bond contingent upon your assuring the court that you will keep these children in the jurisdiction of the court during the pendency of this case while Mr. White is recuperating from his illness? A. I will do anything—Q. And you will be willing to permit the children to visit with the grandparents, or with the father at a time that the court will set? A. Yes, sir. Q. During the recessed period? A. Yes, sir. Mr. Brooks: Your Honor, is it necessary that this bond be a cash bond, in the event we can't get $50,000.00? The Court: No, I don't think it will be necessary for it to be a cash bond. Mr. White: May I be heard a little further? The Court: Yes. Mr. White: Judge, you have absolutely no authority to make that bond past the final decree of any kind, so consequently, as soon as you issue the final decree giving this girl the custody of these children she would take them and go to Florida. There is no way for you to do it after the decree at all. That would slough off just like any other provision, and

please, sir, don't misunderstand me, I just have studied that question pretty thoroughly. And, Judge, under the circumstances I would just rather go on with the case than to have to submit to any conditions about bond. The bond thing might work for a temporary time but not any further, because you have no authority after a final decree, if you give her custody, to say where she can keep the children. And the greatest trouble with one of these cases—The Court: I certainly would have during the pendency of this case while you are on your vacation. Mr. White: No, sir, she has possession of them and you pass a final decree—The Court: Well, I wouldn't pass a final decree. Mr. White: I don't want her to have possession at any time until you pass the final decree—whenever the final order comes out in the case, which we are to obey and the Supreme Court says we will obey, we will do it without any question, please, sir. I am going to try my best to keep from getting the possession pending the outcome of the litigation, not because of you or me or anything else, but because of technicalities in the law. You see, when they get possession, even temporarily, under a mistaken notion of law like we have got in this case, which I think is one please, sir. Most everything I say I mean to be in a contention please, sir, I am not saying to you flatly so that you will get your dander up about me making statements. I just want to respectfully submit to Your Honor that they took these children to Miami last year flagrantly in the face of a court order, she and her mother took them. They had heard read the order, they knew all about the order, but it made no difference, and they took them about the first of June, or May, I have forgotten which, I believe that was in '58, Judge, instead of '59, last year, and the only way I ever got them to come back up here, if you want to know the God's truth, was file a couple of damage suits which you know something about simply because you passed on them, and at that time I had Tom Long's word to me they would get out of the case if they didn't get back up here, and he would see that they got here. Tom is a gentleman that I trusted about that. Now they got back up here sometime in October. Now during that time we never saw the children. In addition to that, sir, from February 13th, when

they first moved over to Mrs. Dodd's, Mrs. Dodd kept this boy from seeing the children, about three or four times he got to see them in that whole time, so for nearly a year—or let's say six or eight or ten months the children's father didn't get to see the children. And so under the circumstances, the little time that you have here—and if I am adding two weeks to it because of that, I would rather not, I would rather hurt muself than to let that happen, please, sir, and I mean it most respectfully. And, Judge, as I—Judge, I am not trying to defy you. I am not trying to flagrantly say you have not got any authority. The Court: Well, Mr. White, the agreement under which they have been operating has permitted the mother to have the children on every other weekend during the past year, and if she has them every other weekend what great harm. She hasn't had them— Mr. Brooks: Until the litigation started, at which time she has been deprived—Mr. White: And that changed the texture and context of the whole thing, legally speaking. Mr. Brooks: And during this award she has had these children every other weekend and she has not taken them out of the jurisdiction of this court. The Court: Certainly if she was going to take them out of the juridsiction of the court she could have done it on the weekends. Mr. Brooks: At any time she had them. Mr. White: Well, sir, if my continuance is based on that please, sir, I will have to stay here and go through the case, Your Honor. And I will just not let my client submit to that, or consent to it, and I do it most respectfully, please, sir. The Court: Do you withdraw your motion for a continuance then? Mr. White: No, sir, I made the motion and I asked for it, but I didn't know the contingency at that time. It is up to you to pass on it or refuse it or grant it or what not, and put it on terms, and if I can't take those terms I won't. The Court: Well, we will have to recess again. (Recess taken.) The Court: Are all witnesses in the Slater case in the courtroom? Mr. Brooks: No, sir, they are not. The Court: Have all the witnesses in the Slater case come to the courtroom? Mr. White, I have dictated and signed the following order in this case.' The court thereupon read said order which is as follows: 'Mrs. Norma Jane Dodd Slater v. Robert Lee Slater, III, No. A-65888, Ful-

ton Superior Court.—Order. The within and foregoing case came on to be heard before me on the 29th day of March, 1960, at which time the court heard argument for approximately one day, and recessed the trial of the case from time to time since that date because of the alleged illness of counsel for defendant, the court having recessed the trial on one occasion for a period of two weeks in order to permit counsel for defendant to recuperate from his illness. On April 13, 1960, the trial resumed and was again recessed until the following day, at which time counsel for the defendant made a motion that the case be continued on account of his alleged illness, which motion was not granted. On that same day, in the afternoon, counsel for the defendant requested the court to recess the trial of the within and foregoing case at 3:25 P.M. so that he may attend a hearing at the justice of the peace court in this county in order to represent one of his clients. The case was thus recessed until 9:15 A.M. on April 15, 1960. During the testimony, on April 14, 1960, of the paternal grandmother, Mrs. Robert Lee Slater, Jr., she stated that counsel for defendant had instructed her not to permit the plaintiff mother to see the children during her usual visitation periods. Therefore, while this court is of the opinion that Mr. White, counsel for the defendant, is not physically able to proceed with the trial of this case, and will grant to him a recess of this trial for another two-week period so that he may go to Florida and recuperate from his illness, nevertheless, in view of the various equities of this case, including, among other things, the fact that plaintiff mother has not been able to visit with her children for a period approaching a month, and the fact that she has diligently appeared in court together with her witnesses and counsel on numerous occasions from March 29, 1960, to the present date. It appears to this court proper that she not be further affected by this further delay, it is hereby considered, ordered and adjudged that the defendant, Robert Lee Slater, III (and Mr. and Mrs. Robert Lee Slater, Jr., they all being in court at the present time and having been subpoenaed as witnesses in this case) be, and they are hereby directed to turn over the minor children, Cynthia Jane Slater and Kandy Lee Slater, to the plaintiff mother,

Mrs. Norma Jane Dodd Slater, who shall have custody of the aforesaid children until counsel for the defendant has recovered and is physically able to appear in court and continue the trial of this case. Further, since, counsel for defendant has stated in open court that the plaintiff in this case is likely to abscond from the jurisdiction of this Court, It is further ordered that the plaintiff, Mrs. Norma Jane Dodd Slater, post a *ne exeat* bond in the amount of $25,000 conditioned upon her appearance in court on the day when the within and foregoing trial will be resumed. The defendant in this case shall have the right of visitation with the children for one day during each week on the day when the defendant, Robert Lee Slater, III, is in the City of Atlanta. Said defendant is directed to inform plaintiff at least twenty-four hours prior to time of his arrival in the city of the day when he would like to have the children with him. And it is so ordered. This the 15th day of April, 1960. /s/ Luther Alverson, Judge, Superior Court, Atlanta Judicial Circuit. Now Mr. White, do you wish to be heard on the order? Mr. White: Yes, sir, Your Honor. I would like to say I object to that order, most respectfully. It is beyond your power and without your authority and jurisdiction to do that at this time, please, sir, and it also makes a continuance on account of my health contingent still on delivery of possession of those children to Mrs. Slater, and sir, as I said before I will go on with the hearing rather than—The Court: I told you this morning before I drafted this order, Mr. White, if you wished to withdraw your motion for continuance I would—Mr. White: I don't withdraw it. I have a right to a ruling by you. The Court: I have ruled, and this is the order based on your refusal to withdraw your motion. This court had you physically examined this morning by two physicians, and the two physicians have informed this court you were not physically able to proceed with the trial of the case, and this court does not wish to endanger your health and well-being by forcing you in the continuation of the trial of this case, however, in that you have instructed, and because of the evidence that I have heard thus far, I think if the case is continued, which it has been for some three or four weeks because of your illness, or alleged illness, then I think

under these circumstances that this mother of these children should have the right to see the children and should have them with her until such time as you are physically able to be back in court. I will require her to post a bond to insure her being back in this court, and in a sufficient sum to insure her being back in this court. She has been here every time and she has been ready to proceed with the trial of the case. Mr. White: Judge, that order is utterly illegal, without authority, if you will permit me to say so, respectfully, sir, and what it does in substance it says to me this, unless you direct these people to give the possession of these children to Mrs. Slater in the interim while I get well—The Court: I am not asking you to direct, the court will—Mr. White: That is what it amounts to. The Court: The court is directing Mr. and Mrs. Slater, Jr., to turn these children over to the mother—Mr. White: You passed an order yesterday striking them as parties. The Court: I realize that— Mr. White: And it has to be another proceeding brought to make them parties to do a thing—The Court: They are in court and they have custody of these children and I think since they are here—they have possession, not custody, as I interpret the law, but the children have been temporarily placed with them and they are in court at this time and the court is instructing them at this time—Mr. White: Now you have put in your order provisions that make me do law work for the next two weeks to try to get them out of that order, which I am going to do. The Court: Well, that is it, Mr. White, even though you contend you have been sick for the last two or three weeks I have had ten or twelve page motions filed by you in court in this matter along with other matters—Mr. White: Well, knowing if I was ever in default in the slightest you would give me the works, so I just try to do my best to be ready. The Court: Would you like to apologize to the court for that statement? Mr. White: When I said give me the works, reprimand me like you have been doing so constantly in this case. The Court: I asked you Mr. White, if you would like to apologize for the statement you made to the court? Mr. White: I said I felt—The Court: Then I take it you do not wish to apologize, is that right? Mr. White: Your Honor, what I said was true,

sir, I am just as sorry as I can be, I said this to Your Honor, that I have tried to even do my work over the telephone to try to get ready with things, that I knew that if I wasn't ready that I believe I would be given a reprimand by you and I have tried my best to be ready. This is the first time in my professional life I have ever asked for continuance here lately on account of my condition, and I am very sorry that it had to happen. The Court: Mr. White, I will let you pay a fine of two hundred dollars ($200.00) or spend ten days in jail after you recuperate from your present illness. Mr. White: All right, sir. The Court: Just have a seat right there. Based on the statement that you made here in the presence of the court directed at the court and in the record and so incorporated in the record in this case, I assume you have it, do you not, Mr. Reporter? Mr. White: If you insist on passing that order I would rather go ahead and try the case. I can not agree to that as a contingency for me to get a leave of absence from you, any such order as you have passed there. I do not think it fair or right, legal, it is utterly beyond your jurisdiction, and I say so most respectfully, please sir, and I have tried my best to cooperate with you. The Court: Well, do you wish to withdraw your motion for continuance? Mr. White: No sir, I am not withdrawing my motion for a continuance. The Court: All right. Mr. White: I have asked you to continue it on account of my physical condition. The Court: I would like for Mr. Robert Lee Slater, III and Mr. and Mrs. Robert Lee Slater, Jr., to come around to the bar. Mr. White: I think they would have the right to confer with me first, sir, and I would like to confer with them. The Court: I do not know that they have any right to confer with you—Mr. White: I think they do, sir, I believe they do and I most respectfully ask for that privilege and right before they are catechized, or examined, or questioned, or directed by you. The Court: They have been directed by me. What I want to see is if they heard the order of the court. Did each of you understand the order, and did you hear it when I read it? You understand the English language? All right, now, Mr. White, you may advise them. But I didn't want them to get out of the courthouse or courtroom before I understand they clearly un-

derstood the intent of the order, which each of them say that they do. Mr. Brooks: I would like to make a statement before they leave. The Court: Sheriff, have Mr. White come back in. Mr. Brooks: I would like, if the court would, to instruct the Slaters the manner in which these children shall be turned over, and in the event there is any difficulty in getting these children we ask that the court grant us the assistance of the sheriff's office in the event they refuse to turn the children over. The Court: Well, I will instruct the sheriff to go out there with you and pick the children up. Mr. Brooks: All right, sir. The Court: Now what about this ne exeat bond? Mr. Brooks: We have been in touch with her regular counsel and it will take us probably an hour to get the bond. I have started the mechanics. The Court: Well, of course, I can't send the sheriff with you to pick up the children until such time as the bond is made, and I wonder, Mr. Brooks, about a ne exeat bond in this amount—you know bonding companies are very reluctant to sign ne exeat bonds, they might do it in this case. Mr. Brooks: Has Your Honor determined the amount it will be? The Court: Well, I previously said $50,000.00 bond. Now if you can't make a ne exeat bond in that amount I can reduce it. Mr. Brooks: May I confer with my client? The Court: Yes. Mr. Brooks: I am going with Mr. Woodall, if the court will allow me to do so, to confer with Mr. Roberts, who represents her business interests, that is, her ordinary legal day-to-day affairs, and confer with him as to what arrangements can be made about the bond. We propose to make it in the next hour or two in the sheriff's office. Will the court give any consideration to reducing the amount of the bond? The Court: Yes, I will. When I said $50,000.00—I can well understand—after searching the law I felt that was the only type bond the court could require under these circumstances, and I think it would probably require the placing of cash with whoever makes the bond, and I would like to hear from you with reference to this. Mr. Brooks: Would Your Honor consider reducing the bond to $25,000.00 where we could get the cash? The Court: Yes, I will make it a $25,000.00 bond. Mr. Brooks: Then I assume when the bond is posted and approved by the sheriff we will have the assistance of

the sheriff's office if necessary in getting—The Court: I will instruct the sheriff to go out there with you to pick up the children. (Recess taken.) The Court: Are you ready, Mr. White? Mr. White: I am not ready but I come in to report to you, sir. Is it all right for me to do so? The Court: Yes. Mr. White: Do you mind if I look at the order just a minute? The Court: I will give you a copy. Mr. White: Judge, on April 13th when we resumed, I made a motion on that date, don't you remember? The Court: You can except to this order in any way you wish, Mr. White. Mr. White: Well, is it open to me to make any suggestions? I am trying to work out something. Sir, may I ask if you would be willing to add this by way of clarification, you state this—and they are hereby directed, to turn over the minor children, Cynthia Jane Slater and Kandy Lee Slater, to the plaintiff mother, Mrs. Norma Jane Dodd Slater, who shall have custody of the aforesaid children until counsel for the defendant has recovered and is physically able to appear in court and continue the trial of this case—. Would you at that time and the time we do appear in court and continue with the case say that possession be turned back over to the Slaters? The Court: No, I will decide that at the time when the case is resumed for trial, I will decide that issue. Mr. White: Judge, I just thought what you have said there that you meant to do that and—The Court: Well, I may do it and probably will do it, but I don't think it is necessary to put it in this order, and I do not wish to obligate the court in that respect at this time. Mr. White: Here is the position I am in, sir, I realize I am not physically able to fight this order. I think it ought to be fought. I think I ought to resist it. The Court: You have a right to fight this order, file an exception to this order. You have plenty of time after you have been away to Florida for two weeks, you can come back and fight this order, fight it in the Appellate Court of this State, and exercise every right you have under the law. The court wants you to have that right. Mr. White: Well, does Your Honor intend to put it into effect here without my getting a chance to do any fighting about it? Would you let these people make bond—The Court: You said, and I had you examined and the doctors say that you are not physically able,

and you have on your own order to your clients instructed them not to let the mother see the children during the pendency of this suit and the pendency of this trial, and it has been continued from time to time on your request. And I just think the mother is entitled to have the children with her some time during this long recessed trial, and I think she should have that right. The father, according to the testimony in this case, comes to Atlanta about one day in the week and when he is in Atlanta on that day I want him to have the privilege of seeing his children, I want them to be with him. Mr. White: Judge, it is in evidence before you, please, sir, without any contradiction the fact that Mr. Marvin Russell read the decree of the court in the presence of this young lady not to take those children out of the jurisdiction of this court before, and she took them, she violated the court's order at that time. The Court: That is the reason I have the $25,000.00 ne exeat bond, which will order her to be here and appear when you are physically able to come back and try the case, and the court will await your pleasure and the condition of your health, and as soon as you are physically able I will proceed forthwith with the trial of the case. Mr. White: Judge, you see the thing that worries me, and of course I am sure that you are aware of it, sir, from this order, I did not want to lose my chance to have the supersedeas by the fact they had possession of the children at the time of your final order. I anticipate from your rulings in this case heretofore that there is a likelihood you will decide to give the custody to the mother. The Court: I don't know what I am going to decide until the case is over, and after I have heard from your witnesses. I may or may not. Mr. White: And, sir, the ne exeat bond could only be good until the day of the final decree that you have here, it has no effect after that time, and completely void after that time, and if it would be some assurance or some way of getting these children back in the possession of these people after this time I would like to have the court to put it in the order. I think it would be a reasonable request. Now the fact that you may not like, Judge, what I have done and said to you, please, sir, don't let that affect you, please, sir. The Court: Mr. White, let me say this to you, this court has the

greatest respect for your ability and this court has admired you over a long number of years. I don't think there is a more brilliant lawyer in the City of Atlanta than you. I have the greatest admiration and respect for you, and I can not understand why you would say what you did to this court this morning. Since I have been on this bench I have tried to show you every courtesy. I have tried to give you full and complete hearings. I just finished a case a week or so ago that took two weeks to try, and I tried to give you a very patient and a very attentative [sic] hearing. I have tried to do so since I have been on this bench in every case you had before me, and there is nothing personal as far as this court is concerned in any way between you and me. I admire you, I have respect for you, and I am just surprised that a lawyer of your intelligence and with your ability would state what you have to this court in open court here this morning and not apologize for it. Mr. White: Now coming to what you have just said a minute ago. We had a jury trial in a long case for a couple of weeks, then I tried to get the Settlemeyer case tried—The Court: And I was kind enough to put that case down so you could hear it. Mr. White: That is right, limiting us to four hours argument, a much bigger case than the one we have got now. And yet when we come into this custody case where we are now, Mr. Wilson Brooks, representing the other side in the case, you have given any amount of time, no limit on anything. Yet the only reason the Settlemeyer case came to you—The Court: I don't think Mr. Brooks has taken more than an hour in the presentation of evidence and argument in the case, all the rest has been your argument and your motions and your testimony. I actually do not think—Mr. White: I am quite satisfied that is not quite true, sir, Judge. The Court: I certainly don't think he has spent more than an hour in the examination of witnesses and the legal argument in the case. Mr. White: The reason the Settlemeyer case came to you—The Court: Well, this doesn't have any—I don't want to hear it. Mr. White: You made the statements and won't let correct them. [sic] The Court: Just have a seat, Mr. White. Mr. White: About this order, I don't think my clients ought to be pushed into an order about a situation like that with me in the

condition I am in, and I respectfully ask you to let me consider the matter further with them before you go and transfer the custody of these children. I am going to see if they can not get somebody else to represent them and fight it. The Court: Well, your request at this time is denied, especially since you advised your client not to permit these children to see their mother while this case—this trial is in progress. Mr. White: I did it on the feeling that since she had taken the children to Florida before, disregarding the order of the court that she will do it again. The Court: But she has had the children with her every other weekend for the last year at least under this other arrangement, and at no time did she leave the jurisdiction of this court as far as I know. You have not presented it, you have not shown me anything. Mr. White: No sir, she wouldn't have done it then, that was in the jurisdiction of the juvenile court at that time, it is only since you have taken it—The Court: Well, Mr. White—Mr. White: I felt like that thing ought to stay in status quo—The Court: You can take exception to any order the court has passed. Mr. White: I tried to take exception yesterday and presented you a bill of exceptions and you have not signed it for me and you have not marked it tendered, and I tried to take exceptions on demurrer—The Court: I don't care to continue this colloquy, Mr. White. What do you wish to do about this case now? Mr. White: I told you I wanted time— The Court: You were not willing to waive your previous motion and you still feel incapacitated to try the case, is that right? Mr. White: Well, sir, I tell you, rather than give up those children under this order I will waive my motion and finish it. The Court: All right. Mr. White: Because I don't want to penalize them on account of me. The Court: When we get Mr. Brooks we will get started with the trial.' . . ."